UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80628-CIV-HURLEY

**MAYFAIR HOUSE ASSOCIATION, INC.,**
           **plaintiff,**

vs.

**QBE INSURANCE CORPORATION,**
           **defendant.**
_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
& DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

**I. Preface**

This is a an insurance coverage dispute over windstorm damage caused by Hurricane Wilma on October 24, 2005. Plaintiff Mayfair House Association ("Association") is a homeowner association which manages a condominium development known as the Mayfair House located at 3589 S. Ocean Blvd. in South Palm Beach, Florida. The Association purchased a commercial residential insurance policy that provided coverage for loss or damage to the condominium buildings from defendant QBE Insurance Corporation (QBE).

When the Association tendered a claim to QBE for windstorm damage to the property caused by Hurricane Wilma, QBE denied that portion of the claim encompassing damages to the exterior windows and sliding glass doors of the individual units, stating that these items were not the insurance responsibility of the Association under the condominium's governing documents, and therefore lay outside the grant of coverage made by the policy.

The Association filed this declaratory judgment action to resolve the contest. The case is

presently before the court on the parties' cross motions for summary judgment. Both parties agree that there are no material facts in dispute and that the motions are appropriately resolved with a legal determination by the court on the issue of whether the exterior glass windows and sliding glass doors in question are components of a covered "building" as that term is defined under the QBE policy.

## II. Fact and Procedural Background

Hurricane Wilma hit South Florida on October 24, 2005, damaging buildings within the condominium development known as the Mayfair House in South Palm Beach, Florida. The Association submitted a claim to QBE for property damage caused by the storm, including a claim for damage to the exterior of the condominium buildings, as well as damage to the individual unit owners' exterior windows and sliding glass doors.

After deduction of the windstorm/hurricane deductible of $531,286.00, QBE paid $330,488.06 for covered damage to the Association's condominium property. However, it refused to indemnify the Association for damage to the individual unit owner's exterior windows and sliding glass doors, asserting that the Association had no insurable interest in these items. Instead, it claimed these items were the sole responsibility of the unit owners to maintain and insure under the Association's governing by-laws and current Florida Statutes, thereby removing these items from the coverages extended by the QBE policy.

In its current declaratory judgment action, the Association concedes that the exterior windows and sliding glass doors are part of the individual condominium "unit" as that term is defined in the Mayfair House Condominium Declaration's By-Laws, and that the responsibility for the maintenance of these items falls on the unit owners. However, it contends that the obligation

to maintain is not necessarily co-extensive with an obligation to insure; that the Association assumed a responsibility to insure these items under the governing condominium documents, and that in any event the Association was free to contract for greater coverages than that it was required to secure under the Condominium Association Agreement, and did in fact obtain a policy from QBE which covered the items in question.

### III. Discussion

#### A. Insurance Policy Construction

The scope and extent of insurance coverage is defined by the language and terms of the policy. *Siegle v Progressive Consumers Ins. Co.*, 788 So.2d 355 (Fla. 4th DCA 2001). In construing an insurance policy, the court should read the policy as a whole, giving every provision its full meaning and operative effect. *Auto-Owners Ins. Co. v Anderson*, 756 So.2d 29 (Fla. 2000). That is, a single policy provision should not be considered in isolation, but rather, the contract shall be construed according to the entirety of its terms as set forth in the policy and as amplified by the policy application, endorsements or riders. *Swire Pac. Holdings Inc. v Zurich Ins. Co.*, 845 So.2d 161 (Fla. 2003); *U. S.B. Acquisition Co v Stamm*, 660 So.2d 1075 (Fla. 4th DCA 1995), *rev. denied*, 670 So.2d 941 (Fla. 1996).

Where no ambiguity exists, an insurance policy shall be construed according to the plain language of the policy as bargained for by the parties. *Auto-Owners Ins. Co. v Anderson*, 756 So.2d 29, 33 (Fla. 2000). Where an ambiguity is found, it must be interpreted liberally in favor of coverage and strictly against the insurer. *Flores v Allstate Ins. Co.*, 819 So.2d 740 (Fla. 2002).

The rule of liberal construction in favor of the insured applies only when a genuine inconsistency, uncertainty or ambiguity in meaning remains after resort to the ordinary rules of

construction. *Deni Assocs. of Fla., Inc. v State Farm Fire & Cas. Ins. Co.*, 711 So.2d 1135, 1140 (Fla. 1998).   Where the policy language is clear, the court cannot indulge in construction or interpretation of its plain meaning. *B. M W. of North America, Inc. v Krathen*, 471 So.2d 585 (Fla. 4th DCA 1985), *rev. den.*, 484 So.2d 7 (Fla. 1986).

A policy is considered ambiguous when the language is subject to "more than one reasonable interpretation, one providing coverage and the [sic] another limiting coverage..." *Anderson*, 756 So.2d at 34.  The lack of a definition of an operative term does not, by itself, however, create an ambiguity. *State Farm Fire & Cas. Co v CTC Dev. Corp.*, 720 So.2d 1072 (Fla. 1998).  Nor does an ambiguity exist merely because the policy is complex and requires analysis to interpret it.  *Swire Pac Holdings*, 845 So.2d at 165; *Koenigsberg v Intercontinental Ins. Co.*, 571 So.2d 578 (Fla. 4th DCA 1990).

## B. Governing Insurance Policy Provisions

The QBE policy covers "physical loss or damage to Covered Property" resulting from any *"*Covered Cause of Loss" [Condominium Association Coverage Form CP 001704 02 ¶A]. "Covered Property," is defined to mean "the building or structure described in the Declarations," [Form CP 001704 02 ¶A.1.a.], the components of which are more specifically defined in a policy endorsement [Form CP 01 91 01 04 ¶B.1] to include:

> f. Any of the following types of property contained within a unit, if your Condominium Association Agreement requires you to insure it:
>
> (1) Your fixtures, improvements and alterations that are a part of the building or structure;
> ...
> g. Fixtures, installations or additions, owned by unit owners and located inside individual units:
>
> (1) Initially installed in accordance with the original plans and specifications,

>> or  replacements of like kind or quality as those initially installed; or
>
> (2)   As existed at the time the unit was initially conveyed, if the original plans and   specifications are not available.

> h.  Any other portion of the condominium property, if your Condominium Association Agreement requires you to insure it....

The essential coverage question thus posed may be divided into three parts: (1) whether the items in question constitute "condominium property" that the Association was required to insure under the Condominium Association Agreement, thus triggering coverage under the definition of "covered building" incorporated at ¶ B.1.h;  (2) whether the items in question are owned by the unit owners, located inside the units, and "initially installed in accordance with the original plans and specifications," or "replacements of like kind or quality as those initially installed," thus triggering coverage under ¶ B.1.g, or (3) whether the items in question are "your [the Association's] fixtures...that are a part of the building or structure" which are "contained within a unit" and further included in the insuring obligations of the Association under the Condominium Association Agreement, thus triggering coverage under ¶ B.1.f. (1).

Because QBE has thus expressly incorporated the Association's governing documents (including the condominium by-laws) into its policy when defining what constitutes a covered "building," it is necessary for the court not only to determine the meaning of the words contained in the four corners of the QBE insurance policy, but also to determine the meaning of the language used in the Association's governing documents and by-laws.

### C. <u>Analysis</u>

#### 1. Insuring Obligations Under the By-Laws

To determine whether the Association had an obligation to insure the items in question under

5

the Condominium Association Agreement, the analysis thus begins with the Mayfair House Declaration of Condominium By-Laws [DE# 26-7], which provide with respect to real property insurance:

> **13.1 PURCHASE OF INSURANCE**. All insurance purchased pursuant to this Section shall be purchased by the Association for the benefit of the Association, the Unit Owners and their respective mortgagees as their interest may appear...
>
> **13.2 COST AND PAYMENT OF PREMIUMS**. The cost of obtaining all insurance hereunder, excluding only the insurance as may be purchased by individual UNIT OWNERS is declared to be a common expense, as are any other fees or expenses incurred which may be necessary or incidental to carry out the provisions hereof...
>
> **13.3 UNIT OWNERS RESPONSIBILITY**. Each UNIT OWNER must obtain insurance, at his own expense, affording coverage upon his own property, and for his own liability and living expenses as may be required by law, but all such insurance shall contain the same waiver of subrogation that is referred to herein and shall waive any right to contribution.
> ...
> **13.4 COVERAGE**. The following coverage shall be obtained by the ASSOCIATION.
>
> a. The building and all other insurable improvements upon the land, including all of the UNITS and COMMON ELEMENTS, and all personal property as may be owned by the ASSOCIATION shall be insured in an amount equal to the maximum insurable replacement value thereof (exclusive of excavations and foundations) as determined annually by the insurance company providing said coverage. ...The foregoing shall not be construed to require the ASSOCIATION to carry insurance coverage for UNIT floor coverings, wall coverings or ceiling coverings, or for electrical or plumbing lines and fixtures, air conditioning and heating systems, appliances and built-in cabinets which are within the boundaries of the APARTMENT and which are the maintenance responsibility of the UNIT OWNER.

The primary purpose of these provisions is to avoid double insurance coverages by allocating insurance responsibility between the Condominium Association and the owners of the individual condominium units. If both the master and individual policies covered the same loss, the unit owner may be compelled to pay twice for the same insurance - once through the

6

homeowners' association dues and then again through individual policy premiums. In addition, the allocation of insurance responsibility in this context avoids disputes over the control of insurance proceeds and the risk of subrogation contests. *Palacin v Allstate Ins. Co.*, 119 Cal. App. 4th 855, 14 Cal. Rptr. 3d 731 (Cal. App. 4 Dist. 2004), citing Scull & Wagner, *Insurance and Damage and Destruction Provisions for Condominiums and Planned Developments* (Spring 1993) 11 Cal. Real Prop. J. 18, 21; *Schiller v Community Technology Inc.*, 78 A.D.2d 762, 433 N.Y.S.2d 640, 642 (1980).

### 2. Insuring Obligations under Florida Statutes

In Florida, the allocation of insurance responsibilities in this arena is further controlled by § 716.111 (11), Fla. Stat., which restricts the types of property which may be included within the insuring obligations of a condominium association. The version of this statute in effect at the time of the subject loss provided:

> (a) A unit-owner controlled association operating a residential condominium shall use its best efforts to obtain and maintain adequate insurance to protect the association, the association property, the common elements, and the condominium property required to be insured by the association pursuant to paragraph (b)....
>
> (b) Every hazard insurance policy issued or renewed on or after January 1, 2004 to protect the condominium shall provide primary coverage for:
>
> 1. All portions of the condominium property located outside the units;
>
> 2. The condominium property located inside the units as such property was initially installed, or replacements thereof of like kind and quality and in accordance with the original plans and specifications or, if the original plans and specifications are not available, as they existed at the time the unit was initially conveyed; and
>
> 3. All portions of the condominium property for which the declaration of condominium requires coverage by the association.

Anything to the contrary notwithstanding, the terms "condominium property," "building," "improvements," "insurable improvements," "common elements," "association property," or any other term found in the declaration of condominium which defines the scope of property or casualty insurance that a condominium association must obtain shall exclude all floor, wall, and ceiling coverings, electrical fixtures, appliances, air conditioner or heating equipment, water heaters, water filters, built in cabinets and counter tops, and window treatments, including curtains, drapes, blinds, hardware and similar window treatment components, or replacements of any of the foregoing which are located within the boundaries of a unit and serve only one unit and all air conditioning compressors that service only an individual unit, whether or not located within the unite boundaries. The foregoing is intended to establish the property or casualty insuring responsibilities of the association and those of the individual unit owner and do not serve to broaden or extend the period of coverage afforded by any insurance contract provided to the individual unit owner. Beginning January 1, 2004, the association shall have the authority to amend the declaration of condominium without regard to any requirement for mortgage approval of amendments affecting insurance requirements, to conform the declaration of condominium to the coverage requirements of this section.

**3. Obligation to Insure Exterior Glass Windows and Sliding Glass Doors**

At ¶ 4.2.2, the Mayfair House Declaration of Condominium By-Laws define the unit perimetrical boundaries as follows:

**4.2.2 PERIMETRICAL BOUNDARIES:**
a. the perimetrical boundaries of the APARTMENT shall be the vertical planes of the undecorated finished interior of the walls bounding the APARTMENT extended to intersections with each other and with the UPPER and LOWER BOUNDARIES.

(1) where there is an aperture in any perimetrical boundary, including but not limited to windows and doors, the vertical boundary shall be extended at all such places at right angles to the dimensions of such aperture, so that the perimetrical boundary at such places shall be coincident with the exterior unfinished surface of such aperture, including the frame work thereto. **Exterior walls made of glass or glass fired to metal framing exterior windows and frames, exterior glass to metal framing exterior windows and frames, exterior glass sliding doors, frames and castings, shall be included within the UNIT and shall not be deemed a COMMON ELEMENT. (**Emphasis Added) .

Under this provision, the exterior glass windows and sliding glass doors are plainly encompassed within the boundaries of the individual condominium "unit," and hence are a

8

maintenance responsibility of the unit owner, a point upon which both parties agree.

However, these items may qualify as components of the "building" covered by the QBE policy under the definition set out at ¶B.1.f.(1) of policy endorsement CP 01 91 01 04 if they are "fixtures" belonging to the Association that are "a part of the building or structure" and are "contained within a unit," provided the Condominium Association Agreement requires the Association to insure them. Alternatively, these items may qualify as components of a covered 'building" under ¶B.1.g. if they are "fixtures" owned by unit owners, and are "located inside individual units," provided they were "initially installed in accordance with the original plans and specifications" of the condominium development, or "replacements of like kind or quality as those initially installed" -- -- *regardless* of whether the Association has an obligation to insure them under the Agreement.

Alternatively, these items may qualify as parts of a covered "building" under the catch all definition set out at ¶B.1.h. if they constitute "any other portion of the condominium property[1]" which the Condominium Association Agreement requires the Association to insure.

The By-Laws broadly require the Association to obtain coverage for "the building and all other insurable improvements upon the land, including all of the Units and common elements, and all personal property as may be owned by the Association." Contrary to QBE's urged interpretation, "as may be owned by the Association" in this context refers to the antecedent "all personal property"

---

[1] "Condominium property" is defined at Fla. Stat. §718.103(13) as "the lands, leaseholds, and personal property that are subjected to condominium ownership, whether or not contiguous, and all improvements thereon and all easements and rights appurtenant thereto intended for use in connection with the condominium." It embraces both "common elements," defined as "portions of the condominium property not included in the units," § 718.103(8) and "units" defined as "part[s] of the condominium property which [are] subject to exclusive ownership." §718.103(27).

9

contained within the same clause. That is, it does not restrict the types of "insurable improvements upon the land"– defined to specifically include the units and common elements -- which the Association is charged with insuring under this provision. Notably, exterior glass windows and sliding glass doors are *not* specifically mentioned in the list of items excepted from the insurance obligations of the Association under this by-law, nor are they mentioned in the parallel category of items which are excepted from the insurance obligations of the Association under Florida Statutes.

In this respect the By-Laws, at ¶ 13.4 specifically relieve the Association of responsibility for obtaining insurance on "UNIT floor coverings, wall coverings or ceiling coverings, or for electrical or plumbing lines and fixtures, air condition and heating systems, appliances and built in cabinets which are within the boundaries of the APARTMENT and which are the maintenance responsibility of the UNIT OWNER."

Similarly, Fla. Stat. §718.111(b)(3) excludes from a condominium association's insuring obligation a number of specific items that are "located within the boundaries of a unit" and which "serve only one unit." excluded from. This list includes, among other things, "window treatments, including curtains, drapes, blinds, hardware and similar treatments" --- but notably does not include any structural components of window apertures, e.g., exterior glass walls or glass sliding doors.[2]

---

[2] At the same time, the Association is presumably charged with the affirmative obligation of securing insurance for these items under § 718.111(b)2., Fla. Stat., which requires a unit-owner controlled association operating a residential condominium to obtain a hazard policy providing primary coverage for "[t]he condominium property located inside the units as such property was initially installed, or replacements thereof of like kind and quality and in accordance with the original plans and specifications or, if the original plans and specifications are not available, as they existed at the time the unit was initially conveyed" ---- language which tracks the definition of covered building component set out at ¶B.1.g. of the policy endorsement.

Thus, the fact that these items fall within the physical boundaries of the individual units does not relieve the Association from an obligation to insure them nor does it necessarily remove them from the umbrella of insurance coverage extended by the QBE policy. At a minimum, the court concludes that these items are "fixtures[3].. owned by unit owners and located inside individual units" which meet the definition of covered "building" set out at policy endorsement B.1..g. [This assumes that the items were either "initially installed in accordance with the original plans and specifications," or constitute "replacements of like kind or quality as those initially installed," a point which defendant does not contest].

Alternatively, the court finds these items constitute some "portion of the condominium property" which the Association is required to insure under its general obligation to insure the "building ..including all of the units and common elements" imposed at ¶13.4 of the Condominium By-Laws, and as such fall within the catch-all definition of a covered "building" component set out at ¶ B.1.h. of the policy endorsement at issue.

### IV.  Conclusion

Reading the entire insurance policy and relevant documents as a unified whole, the court concludes that the exterior glass windows and sliding glass doors fall within the coverage provided by the QBE policy. It is accordingly **ORDERED AND ADJUDGED**:

1. The plaintiff's motion for summary judgment [DE# 11 ] is **GRANTED** and the defendant's cross- motion for summary judgment [DE# 26] is **DENIED.** Final declaratory

---

[3]"Fixtures" are conventionally defined as articles that were once chattels, which, by physical annexation to realty by someone having an interest in the soil, have become part and parcel of the realty. *Illinois Grain Corp v Schleman*, 114 So.2d 307 (Fla. 2d DCA 1959). Under this definition, the exterior windows and exterior sliding glass doors of condominium units are clearly " fixtures" which are items of real property.

summary judgment shall accordingly issue establishing that the windstorm damage to the exterior windows and sliding glass doors of the condominium property at issue falls within the scope of coverage provided by the QBE policy, and that QBE is therefore obligated to indemnify the Association for the subject loss.

2. Final summary judgment shall enter accordingly in favor of plaintiff and against the defendant pursuant to Rule 58 by separate order of the court.

3. The Clerk of Court is directed to **CLOSE** this file and terminate any other pending motions as **MOOT.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 29th day of August, 2008.

_____
Daniel T. K. Hurley
United States District Judge

cc all counsel